**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

RITA V.,

      Plaintiff,

v.                                CIVIL ACTION NO. 2:23-cv-00790

MARTIN J. O'MALLEY
Commissioner of Social Security,[1]

      Defendant.

**PROPOSED FINDINGS & RECOMMENDATION**

Plaintiff Rita V. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f. This matter was referred by standing order to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3). Presently pending before this Court are Claimant's *Brief in Support of Complaint* (ECF No. 7), the Commissioner's *Brief in Support of Defendant's Decision* (ECF No. 8), and Claimant's *Reply Brief* (ECF No. 9).

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner O'Malley was substituted in place of Acting Commissioner Kilolo Kijakazi following O'Malley's appointment on December 20, 2023.

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 7), **GRANT** the Commissioner's request to affirm his decision (ECF No. 8), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A.    Information about Claimant and Procedural History of Claim

Claimant was 49 years old at the time of her alleged disability onset date and 53 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 89-91).[2] She has a high school education, and past relevant work experience as a medical-office receptionist. (Tr. 46-47, 87, 283-84, 301-08). Claimant alleges that she became disabled on December 21, 2019, due to the following physical impairments: chronic osteoarthritic joint pain; degenerative-disc disease; chronic back pain; state-3 polycystic kidney disease/renal failure; cervical stenosis with limited range-of-motion; diabetes with diabetic neuropathy and diabetic retinopathy; hypothyroid condition; gout; depression and anxiety disorders; and sleep apnea. (Tr. 19, 90-91).

Claimant filed her applications for Title II and Title XVI benefits (together, the "claim") on October 6, 2020. (Tr. 19, 255-68). The Social Security Administration (the "Agency") denied the claim initially on May 10, 2021, and again upon reconsideration on April 22, 2022. (Tr. 19, 87-157). Thereafter, on May 13, 2022, Claimant filed a written request for hearing. (Tr. 19, 190-192). An administrative hearing was held before an ALJ on January 4, 2023. (Tr. 19, 41-59). Subsequently on April 24, 2023, the ALJ entered an

---

[2] All references to "Tr." herein refer to the administrative *Transcript of Proceedings* filed in this action at ECF No. 6.

unfavorable decision. (Tr. 16-33). Claimant then sought review of the ALJ's decision by the Appeals Council on June 6, 2023. (Tr. 4, 10). Ultimately the Appeals Council denied Claimant's request for review on October 19, 2023, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 1-3).

Claimant brought the present action on December 14, 2023, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed a transcript of the administrative proceedings on February 6, 2024. (ECF No. 6). Claimant subsequently filed her *Brief in Support of Complaint* on March 6, 2024. (ECF No. 7). In response, the Commissioner filed his *Brief in Support of Defendant's Decision* on April 5, 2024. (ECF No. 8). Claimant then filed her *Reply Brief* on April 19, 2024. (ECF No. 9). Accordingly, this matter is now ripe for adjudication.

### B.    Relevant Evidence

The undersigned has considered all evidence of record pertaining to the parties' arguments, and summarizes the relevant portions[3] here for the convenience of the United States District Judge.

### i.    Treatment Records

On May 4, 2021 Claimant was seen for her impairments of depression and anxiety by psychiatrist Melissa Moody, M.D., at Boone Memorial Hospital Family Medical Center ("FMC") in Madison, West Virginia. (Tr. 849). Claimant presented to FMC on referral from her primary-care physician. (Tr. 850). She reported to Dr. Moody that her depression and anxiety symptoms "started 17-18 years ago after her divorce, then it got

---

[3] Claimant does not raise issues related to her physical impairments in this § 405(g) action; accordingly, the undersigned confines the medical-records summary herein to Claimant's mental-health-treatment records.

worse after her mother passed 2 years ago." *Id.* Treatment notes reflect that Claimant further reported the following history:

> She states that she has panic attacks, that they happen often, she stays home, will be calmly doing nothing and will start screaming. She states this helps the build up of her anxiety, she will have a fast heart rate, can't breathe, and can't focus. She states this happens often . . . in the car and other places as well. She will cry and sob. She avoids large crowds . . . . She feels hopeless and has days when she can't get out of bed. She has sadness, crying spells, and . . . states that she isolated herself . . . . She has a hard time even showering and at times will sleep 20 hours a day.

*Id.* Claimant reported living alone. *Id.* Further, Claimant reported that she had been prescribed Lexapro, which worked for some time, and was presently taking Celexa as prescribed to her by her primary-care physician. *Id.*

On examination, Dr. Moody observed that Claimant had a depressed mood. (Tr. 852). Otherwise, however, Dr. Moody noted that Claimant exhibited a well-groomed appearance; she was alert and oriented, with a cooperative demeanor and good eye contact; her speech had a normal rate and volume; she had a euthymic and appropriate affect, a linear and goal-directed thought process, and a thought form that was free of any obsessions, compulsions, or delusions; and she exhibited average knowledge, age-appropriate insight, reasonable and age-appropriate judgment, calm motor function, appropriate thought content, and intact attention. *Id.* Additionally, Dr. Moody noted that Claimant's memory "appears normal per interview," and that Claimant denied any suicidality, homicidal ideations, or hallucinations. *Id.* Dr. Moody diagnosed Claimant with major depressive disorder, recurrent and severe, with anxious distress, as well as panic disorder. (Tr. 852-853). Dr. Moody's treatment plan was to start the Claimant with a prescription for an additional antidepressant, Abilify, along with her recommendation that Claimant continue taking the Celexa and hydroxyzine that her

primary-care physician had prescribed. (Tr. 853). Dr. Moody instructed Claimant to follow-up in two weeks "with a plan [to] titrate the [A]bilify [prescription] to higher therapeutic doses." *Id.*

Claimant presented to Dr. Moody for follow-up on May 19, 2021. (Tr. 854). There, she reported experiencing some worry and anxiety, but also reported that "she has been doing alright" and "feels the [A]bilify [prescription] has helped slightly with her motivation." *Id.* Claimant reported that she was taking her medications as prescribed, every day, and was "not having any noticeable side effects." *Id.* On examination, Dr. Moody observed that Claimant exhibited a well-groomed appearance; she was alert and oriented, with a cooperative demeanor and good eye contact; her speech had a normal rate and volume; she had a euthymic and appropriate affect, a linear and goal-directed thought process, and a thought form that was free of any obsessions, compulsions, or delusions; and she exhibited average knowledge, age-appropriate insight, reasonable and age-appropriate judgment, calm motor function, appropriate thought content, and intact attention. (Tr. 855). Additionally, Dr. Moody noted that Claimant's memory "appears normal per interview," and that Claimant denied any suicidality, homicidal ideation, or hallucinations. *Id.* Further, Dr. Moody noted that Claimant had an improved, "good" mood. *Id.* Dr. Moody titrated the Abilify prescription up to a dose of 5 mg daily, and otherwise continued the treatment plan; she instructed Claimant to follow up again in two weeks to continue adjusting the Abilify to a higher therapeutic dose. (Tr. 855-56).

Claimant returned to Dr. Moody for follow-up on June 9, 2021. Claimant reported that the Abilify had been "really helpful," that she was "much happier," had "more motivation," and even "has been out fishing" and "doing some projects." (Tr. 856-57). She reported taking her medication as prescribed, and denied any side effects—though she

did report gaining weight and "snack[ing] in the evening more." (Tr. 857). On examination, Dr. Moody observed that Claimant had a good mood and a well-groomed appearance; she was alert and oriented, with a cooperative demeanor and good eye contact; her speech had a normal rate and volume; she had a euthymic and appropriate affect, a linear and goal-directed thought process, and a thought form that was free of any obsessions, compulsions, or delusions; she exhibited average knowledge, age-appropriate insight, reasonable and age-appropriate judgment, calm motor function, appropriate thought content, and intact attention. *Id*. Additionally, Dr. Moody noted that Claimant's memory "appears normal per interview," and that Claimant denied any suicidality, homicidal ideations, or hallucinations. (Tr. 858-59). Dr. Moody's treatment plan was to continue the Abilify prescription at 5 mg daily, continue Celexa and hydroxyzine, and add a prescription for Topamax to address the Claimant's increased appetite. *Id*. Dr. Moody advised Claimant to follow up in four weeks. (Tr. 859).

Claimant returned to Dr. Moody on July 13, 2021, and reported that she "[o]verall feels very happy[.]" (Tr. 860). She did, however, report experiencing "significant cravings for food in the evening" and gaining some weight as a side effect of the medication. *See id*. On examination, Dr. Moody observed that Claimant had a good mood and a well-groomed appearance; she was alert and oriented, with a cooperative demeanor and good eye contact; her speech had a normal rate and volume; she had a euthymic and appropriate affect, a linear and goal-directed thought process, and a thought form that was free of any obsessions, compulsions, or delusions; she exhibited average knowledge, age-appropriate insight, reasonable and age-appropriate judgment, calm motor function, appropriate thought content, and intact attention. (Tr. 861). Additionally, Dr. Moody noted that Claimant's memory "appears normal per interview," and that Claimant denied

any suicidality, homicidal ideations, or hallucinations. *Id.* Dr. Moody's treatment plan was to continue the Claimant's prescriptions but to change the timing of the topamax to morning and evening to address Claimant's weight concerns. (Tr. 861-62). Dr. Moody advised Claimant to follow up in four weeks. (Tr. 862).

At a follow-up appointment with Dr. Moody on September 7, 2021, Claimant reported "[s]he feels her mood is swinging some but overall she is stable and happy . . . and states that she has been doing fairly well" and "has been sleeping well" despite being concerned "about covid and her family members." (Tr. 863). Claimant continued to have a good mood and normal findings on her mental-status examination. (Tr. 864). Dr. Moody continued Claimant on the same treatment plan and advised Claimant to follow up in three months. (Tr. 865).

At a follow-up appointment with Dr. Moody on December 7, 2021, Claimant reported that "she is down around this time of year because she misses her mom," and therefore has felt lacking in motivation . . . [and] wants to go to bed earlier and sleep longer most days." (Tr. 869). However, Claimant also reported "that she has been doing fairly well" and despite feeling down "is trying to do things to help alleviate some of that." *Id.* Claimant further reported "[n]o side effects" as a result of her medication. Claimant continued to have a good mood and normal findings on her mental-status examination. (Tr. 870). Dr. Moody's treatment plan was to continue Claimant's current medications but to raise Claimant's Abilify dose to 10 mg daily; Dr. Moody then advised Claimant to follow up in three months. (Tr. 871).

At a follow-up appointment with Dr. Moody on February 11, 2022, Claimant reported "that she is overall doing well" despite having "a hard time through the holidays from missing her mom." (Tr. 866). Although Claimant reported that "[s]he feels like some

days she just shuts down and stops talking, . . . this isn't too often that she feels it's an issue." *Id.* Claimant reported that she "uses crafts to create and cope" and she believed that "[t]he higher dose of Abilify seems to be helping more." *Id.* Claimant continued to have a good mood and normal findings on her mental-status examination. (Tr. 867). Dr. Moody continued Claimant on the same treatment plan and advised Claimant to follow up again in three months.

When following up with Dr. Moody on May 11, 2022, Claimant reported that she received a diagnosis of "liver cirrhosis secondary to fatty liver" and "fel[t] overwhelmed and upset and nervous about her declining health." (Tr. 1604-05). However, Claimant further reported that she had "good family support" and "has some encouragement that the progression is slow," and was changing her diet to address this problem. (Tr. 1605). Claimant confirmed that she had been taking her medications as prescribed, with no side effects. *Id.* Claimant continued to exhibit a good mood and normal findings on her mental-status examination. (Tr. 1606). Dr. Moody's treatment plan was to continue Claimant on the same medications and additionally to refer Claimant for "therapy services at LPC [Logan Professional Counseling Services]." (Tr. 1607).

Later in May 2022, Samira Farley, from Logan Professional Counseling Services, completed a Mental Health Assessment by Non-Physician at Plaintiff's visit to initiate counseling (Tr. 1628- 39).  Plaintiff reported that she was in a good and supportive relationship, and she loved to read and crochet (Tr. 1630).  Ms. Farley diagnosed Plaintiff with depression and panic disorder, but noted on examination that Plaintiff was relaxed, cooperative, open, genuine, attentive, self-aware, fully oriented, and she made good eye contact, had appropriate speech, and showed good judgment. (Tr. 1630-31).

Subsequently, Claimant followed up with Dr. Moody on August 25, 2022. (Tr. 1608). Claimant reported "that she has been doing well . . . overall feels her mood is good . . . [and] has been going to see a therapist . . . once a week and this has been helpful." *Id.* Claimant confirmed that she had been taking her medications as prescribed, with no side effects. *Id.* Claimant continued to exhibit a good mood and normal findings on her mental-status examination. (Tr. 1609). Dr. Moody's treatment plan was to continue Claimant on the same medications, to recommend that Claimant continue with therapy at LPC, and to return for follow-up in three months. (Tr. 1609-1610).

The most recent record available from Dr. Moody's office appears to be a treatment note from May 8, 2023.[4] (Tr. 13-15). The treatment record notes that Claimant presented to the appointment with her husband; while she reported experiencing some stress due to planning a move and dealing with her elderly father's needs, she also denied having any side effects to her medication and reported that she "still feels like it works well." (Tr. 13). Further, Claimant reported that she was "sleeping well." *Id.* She also reported taking on the task of packing for her upcoming move. *See id.* Claimant continued to exhibit a good mood and normal findings on her mental-status examination. (Tr. 14). Dr. Moody's treatment plan was to continue Claimant on the same medications, to recommend that Claimant continue with therapy at LPC, and to follow up in three months. (Tr. 15).

### ii.    Claimant's Hearing Testimony

At the January 4, 2023 hearing before the ALJ, Claimant was represented by counsel and testified under oath. (Tr. 41-54). With respect to her prior work experience, Claimant testified that she worked as a medical receptionist in the past. (Tr. 44). She

---

[4] Claimant submitted the May 8, 2023 record following the ALJ's unfavorable decision. (Tr. 13-15). On review, the Appeals Council found that "this evidence does not show a reasonable probability that it would change the outcome of the decision." (Tr. 2).

characterized her past work as only partially sedentary, as her job duties at times required her to lift objects weighing up to 30 pounds and sometimes moving heavier objects such as a copy machine. (Tr. 46-47). Claimant testified that she ultimately quit working due to back pain, which caused her to experience falls and to be in constant pain which was sharp at times. (Tr. 48-51). With respect to her mental-health impairments, Claimant testified that she was treating with a psychiatrist as well as a counselor for anxiety and depression. (Tr. 52-53). Claimant described her depression-related symptoms as lack of interest and trouble sleeping, and testified that she had panic attacks as a result of her anxiety. (Tr. 53). Claimant testified that she has difficulty concentrating in that her "thoughts get flighty" and would "go from one subject to another." *Id.* She testified that she would "miss the point of what I'm doing or what I have to do or, you know, what I was supposed to be doing to begin with." *Id.* Finally, she testified that she has difficulty dealing with people in that she would "get really nervous in big crowds and just want to get out of the situation." *Id.* Lastly, Claimant testified that her depression and anxiety symptoms were improving with treatment. With respect to her anxiety, Claimant testified that the frequency of her panic attacks decreased from "like 27 days out of the month having attacks . . . to just a couple a month now[,] [s]o the anxiety is actually getting better." *Id.* With respect to her symptoms of depression, Claimant testified that "[t]he depression is coming along. It's not resolved, but it's coming along." *Id.*

### iii.    Vocational Expert Testimony

At the January 4, 2023 administrative hearing, the ALJ employed vocational expert Christine Carrozza-Slusarski (the "VE") to aid her in determining whether Claimant could perform her past relevant work, or other work. (Tr. 54). The ALJ asked the VE to classify Claimant's past relevant work, and the VE testified that Claimant's past

work as an outpatient/medical receptionist was sedentary. (Tr. 55). Her work as actually performed was at the medium level of exertion due to walking and lifting requirements, and qualified as semi-skilled work with a specific vocational preparation ("SVP") of 4. *Id.* Using the hypothetical-individual technique, the ALJ next asked the VE to assume that a hypothetical individual had the same age, education, and work history as the Claimant who was capable of performing work at the light exertional level, with some additional limitations. (Tr. 55-56). Specifically, the hypothetical individual could occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; and would be capable of tolerating occasional exposure to extreme cold, heat, vibration, and any workplace hazards such as moving machinery or unprotected heights. (Tr. 56). Finally, the hypothetical individual could never climb ladders, ropes, or scaffolds. *Id.* With these characteristics in mind, the VE opined that such a hypothetical individual could perform Claimant's past work as generally performed; however, the individual could not perform Claimant's past work as actually performed at the medium level of exertion due to the lifting requirements. *Id.* Lastly, the ALJ turned to the issue of an employer's tolerance for off-task time, asking the VE to assume that an individual would be off task and need additional breaks beyond those ordinarily provided by an employer for more than 15 percent of a regular 8-hour workday. (Tr. 57-58). The VE opined that no jobs would be available under those circumstances, as "that factor is beyond employer tolerance . . . on a regular basis, so there would be no work in the U.S. economy, no past work, [and] no alternate work[.]" *Id.*

### iv.    Consultative Evaluation

Claimant presented for a consultative psychological evaluation with licensed psychologist Kelly Robinson, M.A., on May 5, 2021. (Tr. 648). Ms. Robinson conducted

an interview and took a personal history, performed a mental-status examination, and administered intellectual-assessment testing as part of the evaluation. (*See* Tr. 648-654).

First, Claimant reported her symptoms to Ms. Robinson, noting a depressed mood for up to five to six days a week, problems sleeping, a diminished interest in activities, problems concentrating, fatigue, lack of motivation, withdrawal from people, crying spells, excessive worry, irritability, restlessness, muscle tension, difficulty concentrating, abdominal distress and fatigue. (Tr. 648). Claimant also described "unexpected fearful episodes characterized by feelings of nervousness, heart palpitations, breathing difficulty, shakiness, sweating, dizziness, a feeling of losing control and chest pressure" at least once per week. (Tr. 648). She reported that no specific event precipitated her episodes, which occurred regardless of whether she was alone or around people. *Id.* Claimant more specifically described her current mood at the time of the evaluation as having a little bit of indifference or a lack of interest, stating "I'd still be in bed if I didn't have an appointment." (Tr. 648). Claimant also reported to Ms. Robinson that she was prescribed Lexapro by her family physician, which helped. *Id.*

With respect to her memory, Claimant reported being sometimes confused or easily distracted, but she stated that "I don't know if I have any more loss of memory than normal, getting older[.]" (Tr. 649). Ms. Robinson noted that Claimant "report[ed] no physician statements regarding memory loss," and that Claimant reported undergoing a "brain scan" in July 2020, with "normal" results. (Tr. 649). Additionally, Claimant reported no prior mental-health treatment. (Tr. 650). Claimant also reported her educational history to Ms. Robinson, stating that she was placed in regular education classes and received average grades before graduating from high school in 1988. (Tr. 650). Recounting her family history, Claimant reported to Ms. Robinson that she has "no family

problems;" additionally, Claimant reported that she has a "good" relationship with her boyfriend of more than 16 years, and that they "rarely argue." (Tr. 650).

Claimant reported engaging in a broad range of daily activities including watching tv; caring for her pets; taking her medications; interacting with her boyfriend, friends, and family members via text, phone, and social media; and visiting family members. (Tr. 653). Claimant reported being able to go to her doctor appointments, accompanied by a family member. (Tr. 653). Additionally, she reported being able to do her laundry and visiting with her boyfriend a few times per month, talking with a friend on the phone, and driving to the pharmacy and grocery store independently. (Tr. 653-54).

Ms. Robinson noted normal mental-status examination findings. (Tr. 651). Specifically, Ms. Robinson noted that Claimant was alert throughout the evaluation; oriented to person, place, time, and date; had a "euthymic" mood, with a broad and reactive affect; had logical and coherent thought processes; had appropriate thought content, with no indication of delusions, obsessive thoughts, or compulsive behaviors; and had no reports of unusual perceptual experiences. (Tr. 651). Likewise, Ms. Robinson noted that Claimant was "within normal limits" with respect to her judgment, immediate memory, recent memory, remote memory, and concentration. (Tr. 651). Claimant also had normal psychomotor behavior and denied any suicidal or homicidal ideation. *Id.*

Testing returned largely unremarkable results. The intellectual assessment returned largely average or slightly below-average scores, with a verbal comprehension IQ of 96 and a full-scale IQ of 87. During testing as well as her interview with Ms. Robinson, Claimant was noted to be "cooperative and friendly" as well as "relaxed and comfortable," easily establishing and maintaining rapport and displaying a consistent level of effort. (Tr. 652). Claimant was further noted to be persistent and requiring little

13

encouragement during testing, with normal motor behavior, speech that was easy to understand, and a normal pace. *Id.* Additionally, "her mood appeared to have no effect on performance" during testing. *Id.* The "Cognistat" test results were average in all categories, including orientation, attention, comprehension, memory, calculations, alertness, and judgment. (Tr. 652-53). Claimant was "within normal limits" with respect to her attention/concentration, persistence, and pace based upon her testing performance. (Tr. 654).

Ms. Robinson further observed that Claimant was able to manage her own self-care, in that she was able to drive herself to the interview unaccompanied, and resides alone in her own home. (Tr. 648). Ms. Robinson also concluded that Claimant is capable of managing her own finances. Claimant had a non-remarkable presentation, with good grooming and personal hygiene; good speech production with normal rate and volume, with no noted speech problems. (Tr. 654). Claimant also presented with an appropriate, "euthymic mood" and "engaged in normal conversation." (Tr. 654). Ms. Robinson also noted that Claimant "maintained good eye contact," and reported having "regular contact with family members" as well as "a good relationship with her boyfriend." (Tr. 654). Ms. Robinson's diagnostic impression was major depressive disorder, recurrent, moderate, as well as panic disorder and generalized anxiety disorder. (Tr. 653). With respect to Claimant's report of cognitive impairment, however, Ms. Robinson found "no neurocognitive diagnosis" based upon Claimant's testing results. (Tr. 653).

### v.    Administrative Findings

Psychological consultant Jeff Boggess, Ph.D. completed his initial review of Claimant's mental-health impairments on May 10, 2021. (Tr. 103-136). On review, Dr. Boggess evaluated the four functional criteria set forth in the regulations for assessing

how severely Claimant's mental disorder limits her functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* With respect to the first and third criteria, Dr. Boggess found that Claimant had "no limitations." *Id.* With respect to the remaining criteria, Dr. Boggess found that Claimant had only  mild limitations  in "interacting with others" and "adapting and managing" herself. (Tr. 104). Dr. Boggess found it significant that, at the time of his review, the Claimant was not receiving any mental-health treatment, and that cognitive testing from the consultative examination showed a low-average IQ with otherwise normal test results. (Tr. 104). Dr. Boggess also pointed to Ms. Robinson's findings from the mental-status examination that Claimant had normal concentration, persistence, pace, and memory, with only mild social limitations. (Tr. 104). Likewise, Dr. Boggess noted that Ms. Robinson's diagnosis of panic disorder and generalized anxiety disorder are "essentially based on the claimant's reported symptoms" only. (Tr. 120). Finally, Dr. Boggess noted that a previous application for benefits—filed by Claimant prior to the claim in this case—was denied by another ALJ on December 26, 2019. (Tr. 60-76). The former ALJ's decision was upheld by the Appeals Council and became the final decision of the Commissioner on September 9, 2020. (Tr. 82). Dr. Boggess explained that the ALJ's previous findings of non-severe mental-health impairments was consistent with Claimant's current medical evidence of record. (Tr. 104).

Psychological consultant John Todd, Ph.D. completed another review at the reconsideration level on April 22, 2022. (Tr. 140-157). Notably, due to the timing of the review on reconsideration, Dr. Todd was able to review Claimant's mental-health treatment records reflecting her treatment with Dr. Moody from May 2021 through early

2022. (Tr. 142-43). Dr. Todd ultimately affirmed Dr. Boggess's findings on reconsideration, noting that the evidence had remained consistent, and supported affirming Dr. Boggess's prior findings "as written." (Tr. 145, 154).

### C.    Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id*. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence.

*See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable

impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an

adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability on December 21, 2019. (Tr. 22). Next, the ALJ found that the following of Claimant's asserted impairments constituted "severe" impairments: osteoarthritis, degenerative-disc disease, neuropathy, diabetes mellitus, chronic kidney disease, obesity, sacroiliitis, duodenal ulcers, gastritis, and liver disease. *Id.*

Turning to Claimant's mental-health impairments, the ALJ discussed each of the four areas of mental functioning as part of the special technique. As to the first area of mental functioning—understanding, remembering, or applying information—as well as the third area of mental functioning—concentrating, persisting, or maintaining pace—the ALJ found that the evidence "supports no limitation." (Tr. 22-23). As to the second area of mental functioning—interacting with others—and the fourth area of mental functioning—adapting or managing oneself—the ALJ found that Plaintiff had a "mild limitation." (Tr. 23). Consequently, the ALJ determined that Claimant's "medically determinable mental impairments of major depressive disorder, generalized anxiety

disorder, and panic disorder, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere." (Tr. X).

Next, based upon these findings, the ALJ found that none of Claimant's impairments, or a combination thereof, met or medically equaled any of the impairments listed in the Social Security Administration's applicable regulations, at 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 23-24). Upon assessing Claimant's RFC, the ALJ determined that Claimant has the ability to perform "sedentary" work as defined in 20 C.F.R. 404.1567(a) and 416.967(a), except that Claimant can never climb ladders, ropes and scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; can occasionally reach overhead with the right-upper extremity; and can occasionally tolerate exposure to extreme cold, heat, vibration, and any workplace hazards such as moving machinery or unprotected heights. (Tr. 26). Notably, the ALJ did not include any mental-health limitations in the Claimant's RFC. *See id.*

Based upon the ALJ's RFC determination and the testimony of the VE, the ALJ concluded that Claimant was able to perform her past relevant work as an outpatient receptionist, as generally performed. (Tr. 32). As a result, the ALJ concluded that Claimant has not been under a disability during the relevant time period and is not disabled under the Social Security Act. (Tr. 32-33). Consequently, the claim for benefits was denied.

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard."

*Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    DISCUSSION

Plaintiff asserts a single allegation of error in this § 405(g) action: that "the ALJ erred by failing to include the [mild] mental limitations she found credible in the RFC finding." (ECF No. 7 at 3). Specifically, as part of the special technique for evaluating the severity of mental-health impairments at the third step of the sequential evaluation process, the applicable regulations set fourth four functional criteria for assessing how severely Claimant's mental disorder limits her functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. As to each of these four functional areas, the ALJ was responsible for assigning a level of functional impairment on a five-point scale: (1) none; (2) mild; (3) moderate; (4) marked; or (5)

extreme. *See* 20 C.F.R. 404.1520a(c)(4), 416.920a(c)(4). Here, the ALJ determined that there were "none" with respect to the first and third areas of function; however, she did find that there were "mild" limitations with respect to the second and fourth areas of functional impairment—interacting with others, and adapting or managing oneself. (Tr. 23).

Claimant argues that the ALJ erred as a matter of law because, after making this finding of mild limitations at the third step of the sequential evaluation, her subsequent discussion of Claimant's RFC did not address "WHY [Claimant's] mild mental limitations did not require an RFC accommodation or impact her ability to perform semiskilled work." (ECF No. 9 at 3). According to the Claimant's characterization, the ALJ merely used "boilerplate terminology restat[ing] the conclusive fact that the ALJ found [Claimant's] mental impairments nonsevere[.]" *Id.* In other words, the ALJ's RFC analysis merely "verifie[d] the presence of [Claimant's] mild limitations in mental functioning while providing no understandable basis for omitting those proven limitations from the RFC, *other than that they were mild*." *Id.* (emphasis added).

The Commissioner argues that the ALJ not only "thoroughly analyzed Plaintiff's non-severe mental impairments at step two of the sequential evaluation process," but also "discussed those impairments within the residual functional capacity analysis . . . despite [Claimant's] mistaken statements to the contrary[.]" (ECF No. 8 at 13). Specifically, the Commissioner highlights the portion of the RFC analysis in which the ALJ discussed the prior administrative findings of the psychological consultants, Dr. Boggess and Dr. Todd, as well as the prior ALJ's findings in Claimant's former application for benefits. *Id.* (citing Tr. 31-32).

In her reply brief, Claimant reiterates that "[t]he ALJ's summary of the Agency's non-examining medical consultants' opinions was not an analysis of the medical evidence that explained why mild limitations did not impact [Claimant's] ability to work." (ECF No. 9 at 6). According to Claimant's characterization, "the ALJ's finding that these opinions were supported or consistent with the evidence shed no light on her decision to omit all mental limitations from those persuasive opinions from the RFC." *Id.* In support of her position, Claimant relies upon Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *7 (S.S.A. July 2, 1996), for its ruling that "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." (ECF No. 9 at 6). Claimant fails to demonstrate, however, that any of the medical-source evidence conflicts with the ALJ's RFC assessment.

Similarly, Claimant's reliance upon this Court's previous discussion in *Shank v. Saul* is not persuasive under the circumstances of this case. *Shank v. Saul*, 3:20-cv-00444, 2021 WL 2767063, at *8-9 (S.D. W. Va. June 11, 2021), *adopted*, 2021 WL 2744550 (S.D. W. Va. July 1, 2021). In that case, the ALJ completely failed to provide "any insight into why he did not assess any mental RFC restrictions" despite finding *moderate* limitations in areas of mental functioning. *Id.* at *8. Instead, the ALJ in *Shank* summarily listed claimant's mental impairments with no further discussion. Without anything upon which to base the ALJ's determination, the reviewing court in *Shank* was unable to determine whether the RFC was supported by substantial evidence; thus, meaningful review was frustrated and remand was proper. *Id.*

Entirely unlike the ALJ's written decision in *Shank*, however, in this matter the ALJ repeatedly and consistently showed with citation to specific record evidence that, despite having been diagnosed with major depressive disorder, generalized anxiety

disorder, and panic disorder, Claimant's mental-health symptoms were well-controlled on medication. To be sure, the ALJ could have been more explicit in the specific section of her written decision in which she discusses Claimant's RFC. Nonetheless, Claimant's assertion of error is simply not borne out by the record. In reading the ALJ's written decision as a whole, the ALJ's analysis appropriately included consideration of Claimant's mild limitations, and makes it very clear that the consistently normal mental-status examinations evident in the medical records showed that Claimant's symptoms improved and were effectively managed with medication. Based upon this evidence, the ALJ found that there were no more than minimal work-related limitations.

With respect to interacting with others, the ALJ acknowledged Claimant's hearing testimony that she had difficulties dealing with others, as well as Claimant's self-reported symptoms at her consultative examination, such as "depressed mood, withdraw from people, panic attacks, and difficulties presenting the correct words when speaking at times." (Tr. 23, 649, 653). Additionally, the ALJ noted "[t]reatment records contain some abnormal mood findings, such as a depressed mood rarely." (Tr. 23). For instance, notes from Claimant's initial May 4, 2021 visit with Dr. Moody show she had a "depressed" mood. (Tr. 852). However, the ALJ explained that this was a "rare" occurrence, and contrasted it with other evidence. (Tr. 23). The ALJ found it significant that Claimant "treated her psychological impairments with medications and described improvement." (Tr. 23). The ALJ also found it significant that, in addition to treatment with medication, Claimant attended therapy once per week which she described as helpful. (Tr. 23, 1608).

The ALJ pointed to "overwhelmingly" unremarkable findings in Claimant's mental-health-treatment records—particularly treatment records from Dr. Moody's office reflecting treatment Claimant received between June 9, 2021, through February 11, 2022.

(Tr. 22-23, 849-883). Those records showed normal memory and normal mental-status examinations during this time period, along with clear and steady improvement in Claimant's symptoms. (Tr. 849-883). As the ALJ observed, Claimant's mental-health records "overwhelmingly describe the claimant as making good eye contact, having intact attention, and being alert and oriented." (Tr. 23, 852, 855, 858, 861, 864, 870). Moreover, the ALJ notes that Claimant "was overwhelmingly described as being cooperative, [and] having a good mood[.]" (Tr. 23, 852, 855, 858, 861, 864, 870, 1606). "In fact," the ALJ observed, "the claimant was even noted to be cooperative with appropriate behavior in an emergency room" visit in July 2020. (23, 390).

The ALJ also thoroughly discussed Claimant's own statements—as set forth in her function report, hearing testimony, treatment records, and in the history she provided to Ms. Robinson—which support the ALJ's determination. (Tr. 22-23). Claimant described being able to independently perform self-care and activities of daily living, including activities such as driving, managing her finances, and shopping in stores. (Tr. 22-23, 333, 653-54). She associated her periodic memory problems with normal aging. (Tr. 22, 649). She "was also noted to be fishing, doing projects, and doing crafts." (Tr. 23, 857, 866). In her function report, she denied "any problems getting along with family, friends, neighbors, or others." (Tr. 23, 332). The ALJ noted Claimant's report to Ms. Robinson that she had "regular contact with family members," as well as "having a good relationship with her boyfriend, and using Facebook daily." (Tr. 23, 653-54). Further, while Claimant reported "not fishing or doing outdoor activities like she used to" in a function report she completed on November 15, 2021, Claimant also reported that she enjoyed hobbies such as reading, crafts, fishing, and painting—and the ALJ pointed to treatment notes reflecting that Claimant actively engaged in these hobbies during the relevant time period,

including a treatment note by Dr. Moody on June 9, 2021 noting that Claimant "has been out fishing[.]" (Tr. 23, 857).

In addition to Claimant's own statements, the ALJ further highlighted Ms. Robinson's findings from the consultative psychological evaluation. Ms. Robinson found that Claimant was "within normal limits" with respect to personal judgment, as well as with respect to her immediate, recent, and remote memory. (Tr. 22). Consultative examination findings further showed Claimant "completed standardized testing with a consistent level of effort, persisted with little encouragement, and worked at a normal pace," with fairly average results. (Tr. 23, 652). Additionally, the ALJ noted Ms. Robinson's findings that Claimant's "attention/concentration, persistence, and pace were within normal limits." (Tr. 23, 654). Further, Ms. Robinson "found the claimant's mood was euthymic, her affect was broad and reactive, and her speech production was good." (Tr. 23, 648-55). The ALJ also noted that Ms. Robinson described Claimant as "cooperative and friendly" during the interview, with good eye contact. (Tr. 23, 654).

The ALJ explained that, taken together, this evidence did not indicate "there is more than a minimal limitation in the claimant's ability to do basic work activities." (Tr. 23-24). In the subsequent portion of her written decision in which she addressed Claimant's RFC, the ALJ further explained that she found the opinions of Dr. Boggess and Dr. Todd to be persuasive, that overall Claimant exhibited normal functioning in her examination and treatment records. (Tr. 31-32, 89-157). The ALJ explained that, simply put, "*no greater limitations were supported by the record*" in light of Claimant's own "self-reported improvement," and "as demonstrated by the claimant's largely unremarkable findings within both general medical records and professional mental health records." (Tr. 32 (emphasis added), 89-157, 849-883, 1604-1610).

26

Based upon the ALJ's thorough explanation in her written decision as a whole, it is clear that her assessment is supported by substantial evidence. As the Commissioner notes in the parties' briefing, Claimant did not list any mental-health impairments on the portion of her function report which asked how her illnesses, injuries, or conditions limit her ability to work. (Tr. 293). Claimant reported that her illness, injuries, or conditions did not affect her memory, understanding, or ability to complete tasks, follow instructions, or get along with others; further, she represented that she starts what she finishes, follows instructions well, gets along well with authority figures, and does not have any unusual behaviors or fears. (Tr. 298-99). In reporting her ability to function, Claimant also noted that she lived alone in her own home and had no problem with her own personal care; she was able to go out independently, drive a car, shop for food, take care of household needs such as laundry, and handle her own finances. (Tr. 293-97, 331). Claimant reported socializing daily—either in person, through text, on social media, or over the phone—with her family and boyfriend; further, she reported that she had no problems getting along with family, friends, neighbors, or others. (Tr. 297, 653). Likewise, at her administrative hearing, Claimant testified that she had to stop working due to her *physical* impairments; however, she did not refer to any mental-health impairments in this respect, only testifying that she "get[s] really nervous in big crowds[.]" (Tr. 53). Most significantly, Claimant testified that her mental-health impairments of anxiety and depression improved significantly with treatment. (Tr. 52-53).

Claimant is described almost exclusively in her treatment records as being cooperative, having good eye contact and an appropriate presentation, with fairly average cognition and normal mental-status examination results, and being able to complete testing and other tasks with normal concentration, persistence, and pace. Despite

evidence of a low mood on rare occasions in the medical records, Ms. Robinson's consultative evaluation specifically indicated that Claimant's mood "appeared to have no effect on performance." (Tr. 652).

Claimant correctly notes that "even non-severe impairments *can* still cause some slight or minimal limitations in functioning, and those limitations *might* affect the claimant's ability to do some jobs or job functions." (ECF No. 7 at 6) (emphasis added) (citation omitted). However, substantial evidence supports the ALJ's determination that "no greater limitations" than those assessed by the ALJ "were supported by the record in this case." (Tr. 32). When, as here, an ALJ determines that mental impairments create only a mild limitation, the ALJ is perfectly justified in concluding that no related functional limitation belongs in the RFC finding. *Mosley v. Berryhill*, 2:17-cv-04197, 2018 WL 4781297, at *9 (S.D.W. Va. Sept. 5, 2018), *adopted*, 2018 WL 4781183 (S.D.W. Va. Oct. 3, 2018); *Miller v. Colvin*, 2:13-cv-31251, 2015 WL 917772, at *21 (S.D.W. Va. Mar. 3, 2015) (upholding the ALJ's decision to not include a mental limitation in the RFC for a finding of mild mental impairment where there was evidence the mental impairment was non-severe). The parties agree that "[t]he driving consideration is whether the ALJ's analysis allows for meaningful judicial review." *Owens v. Kijakazi*, 22-1273, 2023 WL 2344224, at *3 (4th Cir. Mar. 3, 2023). There is no error, therefore, when—as is the case here—the ALJ's analysis adequately allows the Court to trace the logical and evidentiary basis for her determination, and the record supports the ALJ's analysis that the Claimant is capable of the range of work assessed. While an ALJ may not simply rest on an assumption that mild mental-health limitations do not affect a claimant's ability to perform skilled work, in this particular case the ALJ pointed to the evidence with detail and accuracy and explained why that evidence did not establish any work-related mental

limitations. Claimant has not pointed to any mental-functioning evidence to override or invalidate the ALJ's conclusions. Without more, Claimant has simply failed to demonstrate reversible error.

Accordingly, upon a full and fair review, the undersigned **FINDS** that the ALJ's determination is supported by substantial evidence, and that the ALJ's decision is free of error as it creates an accurate and logical bridge between the evidence and her conclusions sufficient for the Court to conduct a meaningful review. The ALJ's written decision specifically discussed the evidentiary basis for her determination, including the medical records, an analysis of Claimant's own reports and testimony, along with a discussion of the report from a psychological consultative examiner and the prior administrative findings from two state-agency psychological consultants as well as another ALJ's unfavorable decision from a previous claim filed by Claimant. Based upon the ALJ's detailed discussion in this case, it is clear how she reached her determination that Claimant had only non-severe mental impairments that did not support any workplace limitations. As the ALJ's decision is free of error and supported by substantial evidence, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## IV.    RECOMMENDATION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 7), **GRANT** the Commissioner's request to affirm his decision (ECF No. 8), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Berger.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTERED:   November 19, 2024

Dwane L. Tinsley
United States Magistrate Judge

30